[Cite as *State v. Lowe*, 2023-Ohio-1747.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                  No. 111596

    v.                                    :

RAYNELL LOWE,                           :

    Defendant-Appellant.          :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  May 25, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-656568-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey Schnatter, Assistant Prosecuting Attorney, *for appellee.*

Allison F. Hibbard, *for appellant.*

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant Raynell Lowe ("Lowe") appeals his conviction for murder and other felonies.  For the reasons that follow, we affirm.

## Facts and Procedural History

{¶ 2} On August 4, 2020, Z.B. suffered serious injuries that ultimately resulted in his death on August 7, 2020. After a police investigation, a grand jury indicted Lowe for murder as a proximate result of committing felonious assault and endangering children, an unclassified felony pursuant to R.C. 2903.02(B) (Count 1); felonious assault, a felony of the second degree pursuant to R.C. 2903.11(A)(1) (Count 2); endangering children, with a furthermore specification that the violation resulted in serious physical harm to Z.B., a felony of the second degree pursuant to R.C. 2919.22(B)(1) (Count 3); involuntary manslaughter as the proximate result of committing endangering children, a felony of the first degree pursuant to R.C. 2903.04(A) (Count 4); and endangering children, with a furthermore specification that the violation resulted in serious physical harm to Z.B., a felony of the third degree (Count 5). The case proceeded to a jury trial and the following facts were established.

{¶ 3} On August 4, 2020, E.N. and her three children, M.N., age six , Z.B., age two, a newborn, H.N., and Lowe were residing in a home in Garfield Heights, Ohio. E.N. and Lowe had been talking and seeing how their relationship would progress. They had known each other since 2015, had broken up, and reconnected again around July 2020.

{¶ 4} In August, E.N. was in the process of training for a new job. On the morning of August 4, 2020, E.N. woke up late. She was in a rush because she needed to be at work at 11:00 a.m., so she asked Lowe if he would watch M.N. and

Z.B.  H.N. was staying with E.N.'s friend.  Lowe agreed to watch the boys but indicated he had also agreed to watch his siblings at his parents' home and would take the boys there.  Lowe had done this before so E.N. agreed to the plan.  E.N. left home at approximately 10:30 a.m.

{¶ 5} In his statement to police Lowe stated that, sometime after E.N. left, he heard a loud thump downstairs.  This was around 11:00 a.m.  When Lowe went to investigate, he heard one of the boys crying.  On entering the room he determined that it was Z.B.

{¶ 6} Around noon, Lowe texted E.N. to ask where the boys' clothes were.  Lowe did not mention Z.B. in this exchange.  E.N. did not hear from Lowe again until approximately 3:30 p.m.

{¶ 7} In the meantime, Lowe reached out to his best friend Angel Ladson ("Ladson") to ask if she could take them to his parents' home.  Ladson arrived at E.N.'s home to pick them up around 12:15 p.m.  Ladson described Lowe as her best friend but at that time they were considering a romantic relationship.  At Lowe's trial in 2022, Ladson disclosed that she and Lowe married in December 2021.

{¶ 8} On August 4, 2020, Ladson waited outside while Lowe first brought M.N. to the car, and then Z.B.  Lowe asked her if she thought something was wrong with Z.B.  In her statement to police, Ladson described Z.B. as appearing "lifeless."  She testified that she noticed that he wasn't moving that much and his eyes were partially closed.  When Ladson asked Lowe what was wrong with the baby, he told her that he heard a loud noise in the house, heard the baby crying, picked him up to

console him, and then proceeded to dress the baby. Z.B. did not awake during the drive to Lowe's parents' home, a seven-minute drive.

{¶ 9} Once they arrived, Lowe placed Z.B. on a bed in a back bedroom. Z.B. was warm to the touch, so he removed his pants so the air conditioning would cool him. From the time they arrived until about 3:30 p.m. to 4:00 p.m., Z.B. laid on the bed and did not awaken. The adults present, Ladson, Lowe, and Lowe's mother, Latonya Lowe ("Ms. Lowe") thought Z.B. was asleep.

{¶ 10} Ms. Lowe did not notice anything unusual about Z.B. She did notice later that his eyes were half open but she indicated that her stepson used to sleep like that. Although she was startled to see Z.B.'s eyes open, she still thought he was sleeping. She also described him as lying on his back with his hands on his stomach. Although Ms. Lowe maintained that Z.B. seemed normal, at some point she felt a need to tell Lowe that if he thought something was wrong with the baby, he should call E.N.

{¶ 11} E.N. finished work around 2:00 p.m. She then picked up her friend Alexis Williams ("Williams") and drove to Hillcrest Hospital to visit Williams's sister, E.N.'s best friend. Around 3:30 p.m., E.N. received a text message from Lowe telling her to call him as soon as possible. When she called, Lowe told her that something was wrong with Z.B. Lowe told her that M.N. had put a box on top of Z.B.

and "squished" him and that Z.B. was not responding. Lowe sent her pictures of Z.B., as well as a video of M.N. describing what happened. [1]

{¶ 12} E.N. immediately drove to Lowe's parents' home, a 20-30-minute drive. When she got there, M.N. came outside, and she began yelling at him because of what she had been told. Williams entered the home to get Z.B. She found the baby on the bed. From her observation, he appeared out of it. Typically, Z.B. slept on his stomach. That day he was on his back, and she described his arms as "spaced out." When she picked Z.B. up, he did not react. She checked his pulse and found that it was faint. She ran out of the house to E.N. They drove to the nearest hospital, Marymount, which was about five to ten minutes away. During the drive, Williams opened Z.B.'s eyes, tried to talk to him and rouse him. Z.B. was unresponsive. When they arrived at the hospital, Z.B. made a grunting noise and stopped breathing. E.N. ran into the hospital with Z.B.

{¶ 13} Hospital staff at Marymount did a thorough exam of Z.B. and determined that he needed immediate care at a trauma center. Z.B. was then life-flighted to Rainbow Babies and Childrens Hospital ("RBC Hospital") for further care. Despite all attempts to save him, Z.B. succumbed to his injuries on August 7, 2020.

{¶ 14} During trial, evidence was presented that Z.B. had sustained an earlier injury from a fall approximately a week prior to August 4, 2020. On that occasion,

---

[1] It is unclear from the testimony if Lowe took the pictures on his own initiative or E.N. asked him to take them and send them.

M.N. told E.N. that Z.B. fell from the top bunk bed in their room. E.N. was concerned enough about the fall that she took Z.B. to the doctor. Z.B. was x-rayed and no broken bones were found. Although Z.B. had a bruise on his leg and insisted on being carried, he quickly returned to a normal, bright, happy child.

{¶ 15} Dr. Daniel Galita ("Dr. Galita"), a forensic pathologist and medical examiner for the Cuyahoga County Medical Examiner's Office investigated the death of Z.B. on August 8, 2020. Other than a small linear abrasion on his face, there were no external signs of trauma to Z.B.'s body. Observing the eyes, Dr. Galita observed hemorrhages consistent with the violent shaking of a child. (Tr. 446-447.) He observed retinal hemorrhages and retinal detachment, both of which indicate a shaken baby and would not be consistent with a child falling and hitting his head. (Tr. 447.) Dr. Galita also suggested that after Z.B. was shaken he would have "most probably" lost consciousness immediately and been unable to speak or walk. He also opined that Z.B. might have been "lifeless," with a raised temperature. It would be evident to an observer that something was wrong.

{¶ 16} Dr. Galita's expert opinion was that Z.B.'s injuries were so severe that, even if he had been seen promptly, he would not have likely survived. The mortality rate for brainstem injuries is extremely high, almost 100%. Z.B. had a brainstem injury. When asked whether a 48-pound, six-year-old child could generate the kind of force that caused Z.B.'s injuries, Dr. Galita stated, "No. Definitely not." (Tr. 458.)

{¶ 17} Dr. Galita acknowledged that a prior injury may have made a difference, but he did not see evidence of a prior injury during his examination of

Z.B.'s body.  Even if such an injury had occurred, it would not have led to the injuries Dr. Galita saw on Z.B. after his death.  Dr. Galita determined that Z.B. was the victim of homicide.

{¶ 18} Dr. Brian Rothstein ("Dr. Rothstein"), a pediatric neurosurgeon at RBC Hospital treated Z.B. on August 4, 2020.  When Z.B. arrived, they tested his neurological function.  Z.B. received the lowest possible score.  A person with that score would not open their eyes spontaneously or in response to any type of stimulus, not move extremities to any type of stimulus, and be unable to speak or make noises.

{¶ 19} The exam also established that there was a lack of blood flow to the brain.  Dr. Rothstein indicated if they did nothing, Z.B. would definitely die.  However, if they treated him, Z.B. was still at risk for permanent neurological deficits and death.

{¶ 20} When asked about the type of force that could cause these injuries, Dr. Rothstein indicated it would take a significant amount of force, such as from a very high-speed car accident or someone being shaken or shoved.  (Tr. 529.)  When talking about a child, it usually involves some violent movement of the child.  If there had been blunt force trauma, he would expect to observe bruising or a skull fracture.  No bruising or fracture was observed on Z.B.  Dr. Rothstein also observed retinal hemorrhages, which are typically associated with shaking.

{¶ 21} In addition, Dr. Rothstein observed evidence of an injury that occurred approximately a week earlier.  He was hesitant to speculate on the effect of

the earlier injury. However, he noted that falling from a bed of normal height or even from a bunk bed, would not have caused retinal hemorrhages. (Tr. 541.) Even if during this fall, Z.B. hit his head, Dr. Rothstein noted, "I think it would be very challenging to explain the full complement of injuries that [Z.B.] had intracranial, including his eyes and the hemorrhaging inside of his skull, to be accounted for by falling off of a bed." (Tr. 541.)

{¶ 22} Dr. Anne Stormorken ("Dr. Stormorken") a pediatric critical care physician was working as the admitting physician on duty in the intensive care unit at RBC Hospital on August 4, 2020. Z.B. was entrusted to her care right after he received an emergency craniotomy. Dr. Stormorken was informed that Z.B. was injured when another child fell on him.

{¶ 23} Dr. Stormorken indicated that Z.B.'s injuries were out of proportion to another child falling on him. Z.B. had sustained injuries that "had required significant force, beyond the purported mechanism of injury." (Tr. 499.) The type of injuries Z.B. sustained could occur by excessive force, such as in a car accident, or violent shaking. (Tr. 503-504.) There were no external injuries consistent with a car accident. In Dr. Stormorken's opinion the force necessary to cause Z.B.'s injuries could be caused by an adult "very forcibly shaking a very young child." (Tr. 504.)

{¶ 24} When asked about the existence of a prior injury, Dr. Stormorken indicated that there was evidence of preexisting blood that indicated Z.B. had sustained a prior injury. However, it was her opinion that the severity of the injury Z.B. received on August 4, 2020, resulted in his death. (Tr. 509.)

{¶ 25} Both Drs. Rothstein and Stormorken stressed that time was of the essence. With these types of injuries, the sooner a patient is treated the better the possible outcome.

{¶ 26} Dr. Rothstein asked Dr. Lolita McDavid ("Dr. McDavid") to consult on Z.B.'s case. Dr. McDavid was the medical director of child advocacy and protection at RBC Hospital, as well as a professor of pediatrics at Case Western Reserve University School of Medicine. Dr. McDavid was notified when abuse was suspected in a case. Dr. McDavid agreed with Drs. Stormorken and Rothstein that the force necessary to cause Z.B.'s injuries was significant. She noted that children fall all the time, or hit their heads, and you do not see these types of injuries. She specifically noted that Z.B. had retinal hemorrhages and retinal detachment. Typically, those injuries are not seen even in children unrestrained in a car accident. The presence of retinal detachment means that the force was enough that it literally took the retina off of what it is normally secured to in the back of the eye. Dr. McDavid opined that you would not see Z.B.'s injuries from a fall from a bunk bed, car accident, or from children playing or roughhousing.

{¶ 27} Lieutenant Vinson Walker ("Lt. Walker") with the Garfield Heights Police Department was assigned to the investigation and reported immediately to RBC Hospital. He spoke to E.N. there and learned that she was not present when the injury occurred. He also learned that another child had placed a box on Z.B. of some sort, and then jumped on the box. Lt. Walker told a female surgeon at the

hospital how Z.B. was supposedly injured. "[T]hrough a level of professionalism, she kind of told me I probably wasn't correct." (Tr. 567.)

{¶ 28} Lt. Walker also obtained permission from E.N. to allow other officers to search her home. He informed her that she could stop the search at any time if she began to feel uncomfortable. E.N. did not stop the search. Detective Richard Fogle ("Det. Fogle") participated in the search at E.N.'s home. Det. Fogle took pictures of several boxes. They had been informed that the box allegedly used in the incident was for a box fan. None of the boxes he observed matched that description. Additionally, he took pictures of two garbage bins in the back. Neither contained the type of box described.

{¶ 29} Detective Phillip Herron ("Det. Herron") was assigned to the case on August 4, 2020, and assigned to interview Lowe. At that time, Lowe was not a suspect in the case. Det. Herron took Lowe's statement, in which he indicated he heard a thud, and went to investigate, as detailed above. Lowe relayed that he was concerned about Z.B. because he wasn't waking up, but he thought Z.B. was sleeping. Lowe admitted that he did not reach out to any medical professionals, despite these concerns.

{¶ 30} Lowe became a suspect after the detective and his partner met with Drs. Rothstein and McDavid. The doctors explained that the box story was an "impracticability." (Tr. 589.) They relayed that it would be impossible to cause the kind of trauma that Z.B. sustained in that manner. Det. Herron was told that the injuries were caused by a force that could only be generated by an adult. (Tr. 589.)

Based on interviews with E.N., Ladson, and Lowe, the officers determined that Lowe was the only adult present when they believed the injury occurred.

{¶ 31} On redirect, Det. Herron testified that "every doctor that I spoke with after asking questions trying to educate myself, every doctor that I told the story to with the box said there is no way that this happened.  There is no way that is – a six-year-old could have inflicted this kind of injury to a child.  He couldn't have that energy or force to produce to do that kind of injury." (Tr. 596.)

{¶ 32} Ultimately, the jury found Lowe guilty of all charges.  The state elected to proceed with sentencing on Count 1, murder, with Counts 2 and 3, felonious assault and endangering children, merging with Count 1, and Count 4, involuntary manslaughter, with Count 5, endangering children merging into Count 4.

{¶ 33} The trial court sentenced Lowe to 15 years to life on Count 1 and to an indefinite sentence of 10 to 15 years on Count 4, to run concurrently.

{¶ 34} Lowe appeals assigning the following errors for our review.

### Assignment of Error No. 1

Trial counsel was ineffective for failing to object to hearsay testimony by law enforcement officers.

### Assignment of Error No. 2

The trial court erred in permitting hearsay testimony by law enforcement officers.

### Assignment of Error No. 3

Appellant's convictions are against the manifest weight of the evidence; therefore, his convictions are in violation of the Ohio State Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

**Law and Analysis**

{¶ 35} For ease of analysis, we will address Lowe's assignments of error out of order.

**Weight of the Evidence**

{¶ 36} In the third assignment of error, Lowe argues that his convictions were against the manifest weight of the evidence.

{¶ 37} In analyzing the weight of the evidence, we must consider all of the evidence in the record, the reasonable inferences that can be made from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶ 38} The weight of the evidence

concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics but depends on its *effect in inducing belief*." (Emphasis added.) *Black's* [*Law Dictionary*] *supra*, at 1594.

*Thompkins* at 387.

{¶ 39} For weight of the evidence, "the issue is whether 'there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have

been proved beyond a reasonable doubt.'" (Emphasis sic.) *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 52 quoting *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998).

{¶ 40} However, "'[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 41} Lowe challenges his conviction in several respects, alleging that all of the following support a finding that his convictions were not supported by the weight of the evidence: (1) M.N. admitted causing injury to Z.B., and E.N. acted as if she held M.N. responsible; (2) Z.B. had a preexisting injury that could have been the primary cause of his death; (3) the doctors provided contradictory testimony regarding how Z.B. would react to the injuries and the possible effect of the preexisting injury; (4) Dr. McDavid's testimony erred when she described Z.B. as being three years old. Her subsequent testimony was inaccurate because it was based on a three-year-old not a two-year-old. Lowe also points to other "inaccuracies" in Dr. McDavid's testimony; and (5) there was no direct evidence that Lowe had ever harmed Z.B. or done anything to establish that he would harm Z.B.

## The Medical Evidence Removed M.N. as a Suspect

{¶ 42} Lowe's contention that M.N. admitted to "squishing" Z.B. was supported by a videotape. In the videotape, Lowe can be heard questioning M.N. and asking:

Lowe: What did you say you did to your brother, [M.N.]?

M.N.: I said umm I said I left him in the box and squished him.

Lowe: What box? Why you do this?

M.N.: It's in the garbage.

Lowe: Why you do that?

M.N.: Because I was boring.

{¶ 43} Further, E.N. admitted that when she got to Ms. Lowe's home, M.N. came outside and she immediately started yelling at him. Lowe suggests that M.N.'s statements and E.N.'s immediate actions toward M.N. are evidence that E.N. believed M.N. was telling the truth about how Z.B.'s injuries were caused.

{¶ 44} However, none of the doctors who treated Z.B. or examined his body post-mortem believed that Z.B.'s injuries could have been caused by M.N. Dr. Galita, the county medical examiner, testified that a 48-pound, six-year-old child would not be able to generate the force necessary to cause the injuries Z.B. sustained.

{¶ 45} Dr. Stormorken testified that Z.B. had sustained injuries requiring significant force that could not have been caused by another child falling on him. The injuries she observed in the order they would likely have occurred, from her experience, included acute on chronic bleeding and a shift from one side to the other

of some contents of the brain, i.e., a midline shift. Dr. Stormorken explained that when the brain shifts because of an injury, swelling or bleeding results. In this case she observed both swelling and bleeding. A midline shift exerts a lot of tension and pressure on important structures in the middle of the brain that are associated with breathing and heart function. The CT scan showed compression of those central structures. In her experience, Dr. Stormorken believed that those injuries were caused by excessive force, such as in a car accident or violent shaking by an adult. There was no evidence Z.B. had been involved in a car accident; accordingly, violent shaking by an adult was most likely.

{¶ 46} Dr. Rothstein, the pediatric surgeon, agreed that Z.B.'s injuries required a significant amount of force. Further, if Z.B. had been hit or suffered some type of blunt force trauma, he would have expected to see some injury to the head such as bruises or a skull fracture. Z.B. did not have those injuries.

{¶ 47} Finally, Dr. McDavid also opined that Z.B.'s injuries required a significant amount of force and several of those injuries would not be seen in the event of children playing or roughhousing. None of the stories she heard about how Z.B. was injured were consistent with the severity of his injuries, based on her experience and observation.

{¶ 48} Given the foregoing, the jury could have reasonably concluded that M.N. did not cause Z.B.'s injuries.

**Z.B.'s Preexisting Injury**

{¶ 49} Two of Z.B.'s treating physicians testified that there was evidence that Z.B. had suffered some type of injury to his brain at least a week prior to his death. Lowe's attorney asked questions at trial, suggesting that this prior injury caused or exacerbated the injury Z.B. suffered on August 4, 2020, leading to his death.

{¶ 50} Dr. Rothstein observed evidence of a prior injury; however, it was his opinion that the panoply of Z.B.'s injuries observed on August 4, 2020, could not be attributed to a previous fall. Dr. Stormorken likewise observed a prior injury. However, she also felt that the injuries of August 4, 2020, were the cause of Z.B.'s death, not the prior injury.

{¶ 51} Furthermore, E.N. took Z.B. to the doctor after the first fall. Dr. Rothstein indicated that if Z.B. had a fall and he exhibited symptoms of a head injury, a CT scan would have been done. A review of Z.B.'s medical records from the earlier exam established that a C.T. scan was not requested. Furthermore, all evidence, including Lowe's own statements to police, indicated that Z.B. did not appear to have any significant issues until after what occurred on August 4, 2020.

{¶ 52} Accordingly, the jury could have reasonably believed that Z.B.'s fatal injuries were the result of whatever happened on August 4, 2020, not the previous fall.

**The Medical Testimony Was Consistent as to the Cause of Injury**

{¶ 53} Lowe next argues that the doctors' testimony was inconsistent regarding the effect of a prior injury and Z.B.'s likely reaction to being injured.

However, the nature of the prior injury was largely unknown. E.N. was not in the room when the injury occurred. M.N. reported to her that Z.B. fell from the top bunk. The record does not go into more detail than that. The doctors were asked to discuss whether that prior injury would affect the injury that occurred on August 4, 2020. While the doctors had varying thoughts on what might have occurred, they all agreed that the injuries sustained by Z.B. when seen on August 4, 2020, were the result of significant force, typically seen in a child who had been violently shaken by an adult.

{¶ 54} Additionally, it was clear that the witnesses were discussing possible symptoms, i.e., symptoms that might be seen in a child who was violently shaken. Ultimately, the doctors all reached the same conclusion: Z.B.'s injuries were the result of having been violently shaken by an adult.

## Dr. McDavid's conclusions were consistent with Drs. Galita, Rothstein, and Stormorken

{¶ 55} Next Lowe points to minor mistakes in Dr. McDavid's testimony regarding Z.B.'s age and statements that he deems were inconsistent with other witnesses. First, with respect to age, regardless of that error, Dr. McDavid's conclusions that Z.B.'s injuries were the result of significant force were consistent with the three other doctors' testimonies. Second, Lowe argues that Dr. McDavid's observation of retinal detachment differed from Dr. Rothstein's assessment. This is not the case. At one point towards the end of his testimony, Dr. Rothstein stated that he "did not believe" there was retinal detachment. However, Dr. Galita testified

that he observed retinal detachment during the autopsy, confirming Dr. McDavid's observation. Consequently, the jury could have elected to believe the definite statements of Drs. Galita and McDavid, rather than the somewhat equivocal statement of Dr. Rothstein.

**The Greater Weight of the Evidence Established Lowe as the Perpetrator**

{¶ 56} Finally, Lowe argues that the weight of the evidence did not establish that he caused any harm to Z.B. We disagree. Although no one testified to what actually happened to Z.B., the evidence established that Lowe was the sole adult present, and that Z.B. was injured when he was violently shaken by an adult.

{¶ 57} While Z.B. sustained an earlier fall about a week earlier, the only testimony presented was that he cried a little, wanted to be carried, but then returned to normal. None of the people closest to Z.B. testified about a prolonged illness, instability, mood changes, or any other factors to suggest that the effects of that fall lasted more than a day or two. E.N. testified that Z.B. wanted to be carried at first but returned to normal quickly. In his statement to police, Lowe said that after E.N. left he was moving around the house, going up and down the stairs and could hear the boys laughing and playing. It was not until after he claimed to have heard a thud that he began to notice changes in Z.B.'s demeanor.

{¶ 58} Independent witnesses, some who testified on Lowe's behalf, confirmed the change in Z.B. on August 4, 2020. When Ladson gave a statement to the police, she described Z.B. as "lifeless" when she arrived at 12:15 p.m. that day. Per Lowe's statement, this was shortly after the supposed injury. Once they reached

Ms. Lowe's home, Z.B. remained in that condition. He was placed on a bed where he stayed until E.N. and Williams arrived almost four hours later. Lowe undressed Z.B. because he felt warm and he thought he was feverish. Prior to E.N.'s and Williams' arrival, Z.B. stayed on the bed, "asleep," eyes half open and occasionally moving.

{¶ 59} In addition to all of this, Lowe was clearly aware that something was wrong with Z.B. The first thing he asked Ladson when she arrived was whether she thought something was wrong with the baby. Further, Lowe's mother acknowledged that she advised Lowe to call E.N. if he was concerned about Z.B. It would be reasonable to assume she gave that advice because Lowe expressed some concern about the child. Yet, Lowe did not call E.N. until Z.B. had remained unresponsive for almost four hours. He also did not take him to Marymount Hospital, which was just ten minutes away. When he finally called E.N., he provided a video of M.N. confessing. Lowe told the police that he did that because the adult always gets blamed when they are watching a child and a child gets injured.

{¶ 60} The jury could have reasonably believed that (a) Z.B.'s injuries were the result of an adult violently shaking him; (b) that Lowe was the only adult present; (c) that Lowe was aware that there was something seriously wrong with Z.B.; (d) Lowe attempted to deflect attention from himself by videotaping M.N. and (e) Lowe did nothing to help the child for a prolonged period of time. In sum, the jury could have reasonably believed that Lowe violently shook Z.B. causing his death and that Lowe's delay in getting help for Z.B. was also a factor in his death.

{¶ 61} Based on the foregoing, the record reflects that Lowe's convictions were supported by the greater weight of the evidence.

{¶ 62} Accordingly, the third assignment of error is overruled.

**Plain Error and the Admittance of Hearsay Testimony**

{¶ 63} In the second assignment of error, Lowe argues that it was plain error for the trial court to allow the admittance of hearsay testimony from police witnesses. In the instant case, two police officers testified regarding information they received from doctors during the course of the investigation. However, Lowe failed to object to this testimony.

{¶ 64} "Failure to object waives all but plain error on appeal." *State v. Friscone*, 8th Dist. Cuyahoga No. 107801, 2019-Ohio-1781, ¶ 23. In order to prevail, Lowe must establish plain error mandating relief.

{¶ 65} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In order to find plain error, we must make three findings. "First, there must be an error, i.e., a deviation from a legal rule." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L. Ed.2d 508 (1993). Second, the error must be plain, i.e., it must be an "obvious defect in the trial proceedings." *Barnes* at 27, citing *State v. Sanders*, 92 Ohio St.3d 245, 750 N.E.2d 90 (2001). Finally, "the error must have affected 'substantial rights.'" *Barnes* at 27. An error affects a substantial right if it "affected the outcome of the trial." *Id.*

{¶ 66} Lowe argues that three statements made by two officers during the course of the trial were inadmissible hearsay. First, he objects to the following testimony from Lt. Walker:

> State: Now did the doctor who you spoke to indicate in any way that the source of injury was credible or that she thinks that Z.B. actually was injured in the way that they reported?
>
> Lt. Walker: Through talking to her, I relayed what information I had to her. And ***through a level of professionalism, she kind of told me I probably wasn't correct, but she didn't speculate further.***

(Emphasis added.) (Tr. 569.)

{¶ 67} Second, he objects to two statements made by Det. Herron. The first was as follows:

> State: At what point in your investigation did you consider Mr. Lowe a suspect?
>
> Det. Herron: The very next day, which would have been August 5, 2020, myself and Lt. Petrick were summoned down to UH Rainbow and Babies to meet up with two members of the Department of Children and Family Services to have a meeting with the Dr. Rothstein and Dr. McDonald.
>
> State: It might be Dr. McDavid.
>
> Det. Herron: McDavid. I'm sorry.
>
> State: * * * At that point you believed that Mr. Lowe may be a suspect?
>
> Det. Herron: We learned from the doctors after explaining the situation that we were presented with that there was a box involved, and maybe [M.N.] was jumping on the box.
>
> Det. Herron: ***It was explained to us that that was an impracticability; impossible to have cause the kind of trauma that was dealt to [Z.B.]. It was a force that can only be generated by an adult is what we were told.***

(Emphasis added.) (Tr. 588-589.)

{¶ 68} The last statement was as follows, with a little added context:

State: And through your investigation, did the story from [M.N.] have any weight or were you able to confirm that story through your investigation?

Det. Herron: We couldn't find a box. He did ask [E.N.] about a fan box that was brought up. And that box was – she said there was a fan box. It was a gift given to her, I believe, by her mother, and that box had been thrown out approximately a month prior to this incident.

State: And did the medical – the conversation with the medical professionals have any impact on the story that [M.N.] gave?

Det. Herron: No. ***Every doctor that I spoke with after asking questions trying to educate myself, every doctor that I told the story to with the box said there is no way that this happened. There is no way that is – a six year old could have inflicted this kind of injury to a child. He couldn't have that energy or force to produce to do that kind of injury.***

(Emphasis added.) (Tr. 596.)

{¶ 69} Preliminarily, we must determine whether the statements in question are "hearsay." Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Consequently, a statement is not hearsay when it is offered for a purpose other than to prove the truth of the matter asserted. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118.

{¶ 70} Additionally, courts have found that it is not hearsay when a law enforcement officer testifies about an out-of-court statement for the purpose of

explaining the next step in the investigation. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 186.

{¶ 71} Such a statement is admissible as nonhearsay if "(1) 'the conduct to be explained [is] relevant, equivocal, and contemporaneous with the statements,' (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) 'the statements cannot connect the accused with the crime charged.'" *McKelton*, quoting *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27.

{¶ 72} Examining the first and second statements Lowe challenges, we find they are nonhearsay. Lt. Walker was the first officer to speak to E.N. and get her understanding of what occurred. She, in turn, relayed to him what she had been told by Lowe. After consulting with Z.B.'s physician, Lt. Walker learned that it was unlikely that Z.B. had been injured by M.N. He then relayed that information to Det. Herron.

{¶ 73} Looking at the first part of the test for admissibility, Lt. Walker's conduct was relevant to the investigation. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Lt. Walker conveyed the information he received to Det. Herron. Det. Herron then used that information, along with information he received, to shift the focus of the investigation away from M.N. and on to determine who else could have harmed Z.B. The statement Lt. Walker relayed was equivocal.

The doctor's statement that it was unlikely that Z.B. was injured by another child did not in and of itself implicate nor clear Lowe. Finally, the timing of the statement was contemporaneous with Lt. Walker's actions in the investigation.

{¶ 74} Turning to the second part of the test for admissibility, we look at the potential for prejudice. The Ohio Supreme Court has noted "if the testimony that is ostensibly offered to explain police conduct is more prejudicial than probative, [that is], the jury is more likely to rely on the testimony to prove the matter asserted, * * * [it] tilts the particular testimony into hearsay." *Ricks*, 136 Ohio St.3d, 995 N.E.2d 1181 at ¶ 26. Lt. Walker testified after the four medical witnesses testified. Accordingly, the jury had already heard directly from the medical professionals that it was unlikely that M.N. generated sufficient force to cause Z.B.'s injuries, nor was there evidence of physical injuries consistent with M.N. jumping on Z.B. while in, or under a box. Consequently, the officers' statement was not more prejudicial than probative.

{¶ 75} Finally, looking at the third part of the test for admissibility, the statement was regarding the nature of the injury, not specifically who caused the injury. The statement did not implicate Lowe at all.

{¶ 76} Likewise, Det. Herron's testimony relaying the information he gathered from Drs. Rothstein and McDavid meet the test as well. Det. Herron indicated that after learning that it was unlikely that M.N. caused Z.B.'s injuries, he began to construct a timeline to determine who had access to Z.B. during the time of the likely injury. Lowe did not become a suspect until Det. Herron established

this timeline. Det. Herron's conduct was thus relevant, equivocal, and contemporaneous with the investigation. The doctors' statement caused the detective to focus on the timeline, it did not point to a specific suspect, and it occurred at a time when the police were still determining what had happened.

{¶ 77} The statement's probative value outweighed any potential prejudice by establishing that the version of events from E.N. and Lowe was unlikely and therefore required further investigation, and yet, it did not specifically single out Lowe as a suspect. Additionally, as with Lt. Walker's testimony, Det. Herron did not testify until after the testimony of the medical professionals, each of whom explained that it was unlikely that M.N. caused Z.B.'s injuries. Finally, neither doctor implicated Lowe in the statement. They merely explained, based on their experience, that it was unlikely that Z.B. was injured in the way E.N. and Lowe described.

{¶ 78} The final statement Lowe challenges is Det. Herron's testimony and notes that every doctor he spoke to denied that M.N. injured Z.B. by jumping on a box. This statement is hearsay and does not meet the requirements of a nonhearsay statement. In the statement, Det. Herron noted that "every doctor" he spoke to told him Z.B. was not injured by M.N. He did not identify the proponents of these statements or indicate when these statements were received and what impact they had on the investigation. Therefore, this statement cannot be accepted as investigative and nonhearsay. Nonetheless, Lowe was not prejudiced by this testimony. The testimony came after it was well established by the medical

witnesses that Z.B.'s injuries were unlikely to have been caused by M.N. Accordingly, although the final statement was hearsay, Lowe was not prejudiced by its admission.

{¶ 79} Accordingly, the second assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 80} In the first assignment of error, Lowe argues he received ineffective assistance of counsel when his lawyer failed to object to the aforementioned testimony of the police witnesses.

{¶ 81} Ineffective assistance of counsel is established when an appellant demonstrates "(1) deficient performance by counsel, namely that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the party, or a reasonable probability that but for counsel's errors, the outcome would have been different." *State v. Moore*, 2022-Ohio-522, 185 N.E.3d 216, ¶ 29 (8th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A 'reasonable probability' is one 'sufficient to undermine confidence in the outcome.'" *Id.,* citing *State v. Mohammad Khoshknabi*, 2018-Ohio-1752, 111 N.E.3d 813, ¶ 29 (8th Dist.), quoting *Strickland* at 694.

{¶ 82} In the instant case, two of the statements identified, one made by Lt. Walker and the first statement by Det. Herron, have been determined to be nonhearsay and therefore admissible. Accordingly, Lowe's trial counsel did not err when he failed to object to those statements. Det. Herron's second statement, which

summarized the information he had gathered from multiple doctors, was admittedly hearsay. However, at the time it was given, all four doctors had already testified, agreeing with the conclusion that M.N. did not cause Z.B.'s injuries.

{¶ 83} Accordingly, Lowe was not prejudiced by the one hearsay statement. It was cumulative to other testimony already taken and could not have affected the outcome of the trial. Lowe has failed to establish that there was a reasonable probability that but for counsel's failure to object the outcome of the trial would have been different.

{¶ 84} Accordingly, the first assignment of error is overruled.

{¶ 85} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

ANITA LASTER MAYS, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR